

U.S. Department of Justice

Antitrust Division

*New York Office*

*26 Federal Plaza*  212/335-8000
*Room 3630*
*New York, NY 10278-0004*  FAX 212/335-8023

May 22, 2018

**VIA ECF**

The Honorable Jed S. Rakoff
United States District Court
Southern District of New York
Daniel Patrick Moynihan Courthouse
500 Pearl Street
New York, NY 10007

>  Re:  <u>United States v. BNP Paribas USA, Inc.</u>, 18-cr-61-JSR

Dear Judge Rakoff:

The United States Department of Justice Antitrust Division ("the Government") submits this memorandum in advance of the May 30, 2018 sentencing of Defendant BNP Paribas USA, Inc. ("BNPP USA"), a U.S.-based holding company of the Paris-based parent bank.

On January 25, 2018, BNPP USA waived indictment and pleaded guilty to a one-count information charging it with violating Section 1 of the Sherman Act, 15 U.S.C. § 1. *See United States v. BNP Paribas USA, Inc.*, 18-cr-61-JSR (S.D.N.Y.), ECF No. 2 ("Information"). Your Honor deferred consideration of the sentence recommended in the Rule 11(c)(1)(C) Plea Agreement entered into between the United States and BNPP USA, *id.*, ECF No. 4 ("Plea Agreement"), pending review of Probation's Pre-Sentence Report.

For the reasons set forth below, the United States respectfully requests that the Court sentence Defendant in accordance with the Plea Agreement, to a fine in the amount of $90 million, and a special assessment of $400, with no order of restitution and no probation imposed.[1] The Government and Defendant agree that this sentence is sufficient but not greater than necessary to comply with the purposes set forth in 18 U.S.C. §§

---

[1] As discussed in more detail below, the recommendation of no probation is not part of the "Recommended Sentence" under the Rule 11(c)(1)(C) agreement, meaning the Court could opt to impose probation in this case without the plea agreement becoming void. Plea Agreement ¶ 2.

3553(a) and 3572(a). The Probation Office, in its Pre-Sentence Report, has recommended the same sentence.

## I. Summary of the Offense

Between September 2011 and July 2013, Defendant engaged in a conspiracy to suppress and eliminate competition by fixing prices in Central and Eastern European, Middle Eastern, and African ("CEEMEA") currencies traded in the foreign currency exchange ("FX") market. Information ¶ 10. It did so through the actions of its former CEEMEA trader, Jason Katz, who pleaded guilty in this District, before Judge Failla, to the same conduct. *See United States v. Katz*, 17-cr-3-KPF (S.D.N.Y. filed Jan. 4, 2017).

In his role as a CEEMEA trader, Katz had two core responsibilities. First, he formulated the exchange rates, or "prices," to be quoted to customers looking to exchange one currency for another, in large amounts, with BNP Paribas. These customers included corporations, hedge funds, pension funds, and investment managers, among other entities. The process of a "market making" bank quoting prices in foreign currencies was subject to competition; just as BNP Paribas would quote prices in an effort to obtain a customer's FX order, multiple other competing banks might be doing the same, with the customer frequently choosing the bank that gave it the most favorable price for a particular FX transaction.

Second, Katz traded CEEMEA currencies with other FX traders in what is known as the "interdealer" market. Katz traded in the interdealer market through a variety of mechanisms, including on Reuters, an anonymous electronic platform through which FX traders indicated, in the form of anonymous bids and offers submitted at varying prices and quantities, what they would pay or receive to exchange certain currencies. Like the market for customer orders, this interdealer market activity was also subject to competition, with CEEMEA traders from rival banks continuously trading in efforts to profit, including at their competitors' expense.

Katz, however, developed a mutual understanding with certain CEEMEA traders at competing banks, that rather than always compete in these ways, they would seek to coordinate their activities in the market, when the right opportunities arose. These competing traders were all members of a private Bloomberg chat room called the "ZAR" chatroom – ZAR being the currency symbol for the South African Rand, a currency these individuals actively traded. In the chat room and through other communication channels including phone calls, texts, and in-person meetings, Katz and his competitors spoke nearly every day, and repeatedly throughout the day, sharing competitively sensitive information and then coordinating their trading in response.

The conspirators' methods of affecting price in CEEMEA currencies spanned the two primary types of competition described above. Paragraph 12 of the Information lays out the Manner and Means of the conspiracy, which are described briefly below, grouped within broad categories:

Coordination of Trading in the Interdealer Market

- **Non-*bona fide* trades (Information ¶¶ 12(a), (b)).** Here, Katz and a co-conspirator would intentionally create a trade on Reuters, to try to give the impression to others transacting on Reuters that a trade in a given currency pair was legitimately "printed" at a particular price level. In actuality, however, Katz and the co-conspirator would nearly immediately offset the trade or cancel it, pursuant to their understanding, and typically through a private trading mechanism so that this subsequent activity would not be seen by other market participants.

- **Coordination of bids and offers (*id.* at ¶ 12(c)).** Katz and his co-conspirators coordinated how they would submit bids and offers on Reuters – with respect to timing, price, and amounts – in order to serve one or more of the co-conspirators' interests at that moment.

- **Refraining from trading (*id.* at ¶ 12(d)).** When Katz and one or more of the group had to buy or sell the same currency pair, around the same time, they had a general understanding that the trader with the biggest need to buy or sell would go into the market first, and the other traders would hold off from trading for a period of time. This was designed to prevent multiple members of the group from simultaneously trading in the same direction, and outbidding or undercutting each other on price, to their collective detriment.

- **Fix trading coordination (*id.* at ¶ 12(e)).** FX fixes were benchmarks, based on samplings of actual trading activity within short windows of time, to which customer orders were pegged. Katz and his co-conspirators coordinated their bidding, offering, and trading in advance of and through these fix windows in efforts to affect the ultimate fix prices.

- **Coordinating trading surrounding customer limit orders (*id.* at ¶ 12(f)).** When a customer placed an FX limit order with a bank, the bank would be obliged to buy from or sell to a customer a particular currency in exchange for another if the exchange rate in that currency pair reached a set level. Katz and his co-conspirators coordinated their trading in advance of, and through, the triggering of customer limit order levels, in efforts to collectively profit.

Coordination in the Customer Market

- **Agreeing on pricing to quote specific customers (*id.* at ¶ 12(g)).** Katz and his co-conspirators agreed on pricing that they would quote to specific customers who were soliciting two or more of them. At times Katz would purposely quote a worse price to allow a co-conspirator to win the customer order.

Other Features of the Conspiracy

- **Communicating through various means (*id.* at ¶ 12(h)).** As described above, Katz was a member of the "ZAR" multibank chatroom throughout most of the conspiracy period. Much of the relevant conduct at issue was carried out

through this chatroom. After the chatroom ended, in January 2013, Katz continued the conduct through other forms of communication which he had been using, including one-on-one chats, phone calls, text messages, Whatsapp, and in-person meetings.

- **Employing measures to conceal the conduct (*id.* at ¶ 12(i)).** Katz and his co-conspirators took certain steps to attempt to evade detection of the conduct by their banks' compliance functions and by others. Among other examples, they used code words to refer to certain customers and would sometimes cease a chat discussion only to pick up the conversation in text messages or in other less detectable formats.

In his allocution, BNPP USA's corporate representative acknowledged that Mr. Katz engaged in this conduct while employed as a currency trader at BNP Paribas Securities Corp., that Katz did so to benefit that entity, and that BNPP USA is responsible in law for Katz's conduct.[2]

## II. Legal Standard

Rule 11(c)(1)(C) authorizes the United States to enter into plea agreements with parties in which the parties agree that a particular sentence is the appropriate disposition of the case. *See* Fed. R. Crim. P. 11(c)(1)(C). The Court, however, "retains absolute discretion whether to accept a plea agreement." Fed. R. Crim. P. 11, Advisory Committee notes to 1999 amendments. As a plurality of the Supreme Court has observed:

> Federal sentencing law requires the district judge in every case to impose a sentence sufficient, but not greater than necessary, to comply with the purposes of federal sentencing, in light of the Guidelines and other [18 U.S.C.] § 3553(a) factors. The Guidelines provide a framework or starting point – a basis, in the commonsense meaning of the term – for the judge's exercise of discretion. Rule 11(c)(1)(C) permits the defendant and the prosecutor to agree that a specific sentence is appropriate, but the agreement does not discharge the district court's independent obligation to exercise its discretion.

*Freeman v. United States*, 131 S. Ct. 2685, 2692 (2011) (plurality opinion) (internal citations and quotation marks omitted). In exercising that discretion, while the district court may accept or reject the proposed Rule 11(c)(1)(C) plea agreement, it may not modify the agreement's terms. *Id; United States v. Green,* 595 F.3d 432, 438 (2d Cir. 2010) (citing *United States v. Cunavelis*, 969 F.2d 1419, 1422 (2d Cir. 1992)).

## III. Sentencing Guidelines

Organizations, such as Defendant, are sentenced pursuant to Chapter 8 of the Sentencing Guidelines. In the case of antitrust violations, however, special instructions

---

[2] During the time period of the conspiracy, Defendant was named Paribas North America, Inc., and was the holding company for the U.S. Corporate and Investment Banking operations of BNP Paribas S.A., the Paris-based parent bank. BNP Paribas Securities Corp., the U.S.-based broker-dealer subsidiary that employed Katz, was a subsidiary of Paribas North America, Inc.

are also applicable pursuant to U.S.S.G. § 8C2.4(b). The relevant special instruction states that, for organizations, "in lieu of pecuniary loss under subsection (a)(3) of § 8C2.4 (Base Fine), use 20 percent of the affected volume of commerce." U.S.S.G. § 2R1.1(d)(1). *See also* Application Note 3 to U.S.S.G § 2R1.1 ("The purpose for specifying a percent of the volume of commerce is to avoid the time and expense that would be required for the court to determine the actual gain or loss."). The organization's culpability score, which is determined pursuant to U.S.S.G. § 8C2.5, is then used to select the minimum and maximum fine multipliers that are applied to the base fine, to determine the applicable Guidelines fine range. *See* U.S.S.G. § 8C2.6.

Here, the calculations result in a Guidelines fine range of approximately $83 to $166 million, based on the following methodology:

Count 1- 15. U.S.C. § 1:

| | | |
|---|---|---|
| | 5 | Base Culpability Score (U.S.S.G. § 8C2.5(a)) |
| | + 2 | Involvement in or Tolerance of Criminal Activity (§ 8C2.5(b)(4)) |
| | - 2 | Cooperation and Acceptance of Responsibility (§ 8C2.5(g)(2)) |
| | 5 | Total Culpability Score |

| | | |
|---|---|---|
| $ 82,930,168 | | Base Fine of 20% of Volume of Commerce (§ 8C2.4(a)(3); § 2R1.1(d)(1)) |
| * | 1. 0 to 2.0 | Minimum and Maximum Fine Multipliers (§ 8C2.6) |
| $82,930,168 to $165,860,336 | | Guidelines Fine Range (§ 8C2.7) |

The Government now turns to the specific factual findings that make up each part of the Guidelines analysis.

### A. Culpability Score

The Government calculates that Defendant's Total Culpability Score under U.S.S.G. § 8C2.5 is 5. The Government started with 5 points as the Base Culpability Score, added 2 points because an individual within substantial authority personnel participated in the offense, and subtracted 2 points because Defendant fully cooperated in the investigation and clearly recognized and accepted responsibility for its criminal conduct.

Under U.S.S.G. § 8C2.5(b)(4), the culpability score increases by 2 points if "the organization had 50 or more employees and an individual within substantial authority personnel participated in, condoned, or was willfully ignorant of the offense." "Substantial authority personnel" includes "individuals who, although not a part of an organization's management, nevertheless exercise substantial discretion when acting within the scope of their authority (*e.g.*, *an individual with authority in an organization to negotiate or set price levels* or an individual authorized to negotiate or approve significant contracts)." Application Note 3(C) to U.S.S.G. § 8A1.2 (emphasis added). Here, Defendant is an organization that, through its subsidiaries, has more than 50 employees; it is the holding company for all of BNP Paribas' U.S. corporate and investment banking businesses, including the FX function in the U.S. Jason Katz, the individual who participated in the antitrust conspiracy, meets the definition of substantial

authority personnel, since he exercised substantial discretion in his role, including by deciding at what prices to bid, offer, and trade, and whether to enter FX transactions with counterparties. Thus, the Government believes that a 2-point enhancement is warranted.

Under U.S.S.G. § 8C2.5(g)(2), the culpability score decreases 2 points if "the organization fully cooperated in the investigation and clearly demonstrated recognition and affirmative acceptance of responsibility for its criminal conduct." Here, Defendant and its parent cooperated with the Government's investigation of the FX market. As evidenced by the Plea Agreement, as well as Defendant's allocution before this Court at the plea hearing, Defendant has clearly demonstrated its recognition and affirmative acceptance of responsibility for its participation in the charged conspiracy. Thus, the Government believes that a 2-point reduction is warranted.

### B. Volume of Commerce

The volume of commerce attributable to a defendant for sentencing purposes in an antitrust case is the volume of commerce "done by him or his principal in goods or services that were affected by the violation." U.S.S.G. § 2R1.1(b)(2). Under Second Circuit case law, the Government need not engage in a transaction-by-transaction analysis to demonstrate which sales were affected by the conspiracy; econometric or expert work is not required. Instead, "[w]hile a price-fixing conspiracy is operating and has *any* influence on sales, it is reasonable to conclude that all sales made by defendants during that period are affected by the conspiracy." *United States v. SKW Metals & Alloys, Inc.*, 195 F.3d 83, 90 (2d Cir. 1999) (internal quotation marks and citation omitted).

Applying these principles to this matter, the volume of commerce theoretically could include the entire dollar volume of Katz's trading in the relevant CEEMEA currencies during the conspiracy period. Such an approach would result in a volume of commerce for BNPP USA in the tens of billions of dollars. The Government recognizes, however, that while a conspiracy existed throughout the duration of the September 2011 to July 2013 time period, implementation of that conspiracy was episodic. These episodes of implementation were frequent but did not subsume every single CEEMEA trade Katz conducted while working for BNPP USA. The Government therefore developed the following methodology to capture volume of commerce:

- The Government identified specific days in which Katz demonstrably carried out the antitrust conspiracy by coordinating his trading with his co-conspirators;[3]

- The Government identified the currency pair implicated by the coordinated conduct on each of these days; and

- The Government summed up the dollar value of the trades executed by Katz in the currency pair on each of those days, starting, for each day, at the time the specific instance of collusion began and ending with the end of the New York trading day.

---

[3] The dates the Government identified included instances of non-*bona fide* trades, coordination of bids and offers, refraining from trading, and coordinated trading surrounding customer limit orders.

The Government believes that this methodology is a fair and appropriate way to subsume the trading of Katz's that should be included in BNPP USA's volume of commerce. Based on this methodology, the Government calculates the volume of commerce for BNPP USA as $414,650,842. The Base Fine is 20% of the volume of commerce, *i.e.*, $82,930,168. *See* U.S.S.G §§ 2R1.1(d)(1), 8C2.4(a)(3).

### C. Fine Range

Multiplying the Base Fine amount of $82,930,168 by the multipliers of 1.0 to 2.0 generated by the culpability score analysis produces a fine range of $82,930,168 to $165,860,336. *See* U.S.S.G. § 8C2.7. As a practical matter, though, the high end of the fine range in this case is $100 million, the statutory maximum fine upon a corporation provided for in the Sherman Act.[4] 15 U.S.C. § 1. The recommended fine of $90 million is within this range. To arrive at this placement of the fine within the range, the Government took into account the §§ 3553(a) and 3572(a) factors laid out in more detail below.

## IV. Statutory Factors to Consider at Sentencing

In addition to considering the Guidelines in effect on the day of sentencing, the Court must also consider the factors set forth in 18 U.S.C. §§ 3553(a) and 3572(a) in determining and imposing a sentence that is "sufficient but not greater than necessary" to meet specified sentencing goals. The most relevant factors in this inquiry include: the history and characteristics of the defendant and the nature and circumstances of the offense (18 U.S.C. § 3553 (a)(1)); the need for the sentence imposed to reflect the seriousness of the misconduct, to promote respect for law, to provide adequate deterrence, and to protect the public from other crimes of the defendant (18 U.S.C. § 3553 (a)(2)(A-C)); and the defendant's measures to prevent recurrence of the offense and to discipline employees responsible for the offense (18 U.S.C. § 3572(a)(8)). The Government submits that the proposed sentence contained in the Plea Agreement is sufficient, but not greater than necessary, to achieve these objectives.

### A. History and Characteristics of the Defendant and the Nature and Circumstances of the Offense

Defendant BNPP USA is the U.S. holding company for BNP Paribas S.A., a global bank headquartered in Paris. Defendant's subsidiary, BNP Paribas Securities Corp., employed Jason Katz, the CEEMEA trader at issue. The Government recognizes that the offense to which BNPP USA pleaded guilty was committed by one employee, among thousands, who was employed by a subsidiary of Defendant for less than two years. That does not excuse the conduct – and indeed, here the bank is taking responsibility by pleading guilty at the U.S. holding company level – but it is a different set of facts than the 2014 sanctions charges to which the parent bank, BNP Paribas S.A.,

---

[4] The alternative fine statute, 18 U.S.C. § 3571(d), permits the imposition of fines that exceed $100 million, where the gross pecuniary gain derived from the crime, or the gross pecuniary loss caused to victims of the crime, is larger than $100 million, "unless imposition of a fine under this subsection would unduly complicate or prolong the sentencing process." For the reasons described in more detail below, the Government did not avail itself of the alternative fine statute in this matter.

7

pleaded guilty, for example. *See generally United States v. BNP Paribas S.A.*, 14-cr-460-LGS (S.D.N.Y.)

Katz's conduct went undetected while he was working for BNPP USA, but once the FX investigation began, Defendant took a number of remedial actions. The bank conducted an internal investigation. It cooperated with the Government throughout the FX investigation, including by producing documents, interviewing relevant employees, and making presentations to the Government, among other steps; the Plea Agreement obliges BNPP USA and its related corporate entities to continue this cooperation. The bank worked to address Katz's conduct specifically by changing its detection tools and its overall approach to the FX business. In short, while Defendant committed a serious offense, it has accepted responsibility and tried to correct the wrongdoing.

As stated above, BNP Paribas S.A. pleaded guilty, at the parent level, to U.S. trade sanctions violations in 2014. This was undoubtedly a serious offense. The Government views that conduct, however, as unrelated to the conduct at issue in this case. Moreover, the conduct in this case predates the guilty plea in the sanctions case.

### B. Seriousness of the Misconduct, Respect for Law, and Deterrence

An antitrust conspiracy is, by its very nature, a serious offense. "[T]here is near universal agreement that restrictive agreements among competitors, such as horizontal price-fixing . . ., can cause serious economic harm." U.S.S.G. § 2R1.1 cmt. background. Here, Defendant, through its CEEMEA trader, conspired to fix prices in a number of emerging markets currencies. The actions of the conspirators violated competitive principles and undermined the integrity of the large, global FX market. The Government believes that the proposed $90 million fine is a substantial penalty that appropriately reflects the seriousness of this offense. This $90 million fine is in addition to the nearly $600 million in financial penalties that the bank has incurred in connection with its resolutions with the New York Department of Financial Services and the Federal Reserve, in May and July 2017, respectively.

The Government also insisted on a plea at the level of the U.S. holding company level. This, too, the Government believes, reflects the seriousness of the offense. Yet it also takes account of the role of Katz within the overall organization, and the relative culpability of BNP Paribas as compared to the banks that pled in May 2015 for their roles in a different antitrust conspiracy that affected the much higher-volume euro/dollar currency pair. *See generally* 15-cr-76-SRU (UBS AG); 15-cr-77-SRU (Barclays PLC), 15-cr-78-SRU (Citicorp); 15-cr-79-SRU (JPMorgan Chase & Co.); 15-cr-80-SRU (The Royal Bank of Scotland plc) (all D. Conn.).

Finally, the substantial nature of the fine and the guilty plea at the holding company level will deter other would-be price fixers, in the financial markets and beyond. It shows that the United States will hold large corporations responsible based on the actions of even one employee, where appropriate. Yet the overall sentence is proportionate and reasonable, showing that the United States will take into account remediation steps, cooperation, and other mitigating factors in fashioning a proposed sentence tailored to the specific circumstances of the case.

### C. Measures to Prevent Recurrence of the Offense and Discipline of Employees

Since its guilty plea in the sanctions case, BNP Paribas has made significant changes to its overall corporate culture regarding compliance. The bank has restructured its compliance function to be separate and independent from its business lines, added substantially to the number of compliance personnel, and implemented a structured and company-wide dialogue regarding corporate ethics and compliance.

With respect to its FX business, the bank has made substantial efforts to address the types of conduct to which BNPP USA has pleaded guilty, to prevent recurrence of the offense. For example, it has implemented various surveillance tools to identify the types of collusive trading behavior at issue here, and implemented active monitoring of trader communications, with former FX traders on staff to assist in those activities. It has introduced fixed fees for certain types of FX trades to reduce conflicts of interest with customers, and automated certain types of FX trades. The bank also has implemented new policies and procedures. Some of these enhancements the bank began following the 2014 sanctions plea; others were a direct outgrowth of the FX investigation.

Under the Plea Agreement, Defendant must continue these efforts to improve its compliance and remediation practices. Plea Agreement ¶ 10. The bank is also obliged to continue its remediation practices as part of its resolutions with the New York Department of Financial Services and the Federal Reserve.

The employee at issue in this case, Jason Katz, had already left Defendant before the bulk of the FX-specific remediation occurred. As stated above, Katz has pleaded guilty to the conduct at issue in this case.

### V. Probation and Restitution

Here, the Government carefully considered whether to include a recommendation of probation, and an order of restitution, against BNPP USA. The Government determined that the imposition of probation and restitution would not be appropriate under the circumstances of this case, for the following reasons.

### A. Probation

Pursuant to 18 U.S.C. § 3561(c)(1), the Court may impose a term of probation of at least one year, but not more than five years. The Government's recommendation that no probation should be imposed in this case is based on a number of factors. First, as discussed above, Defendant's global parent, BNP Paribas S.A., pleaded guilty in 2014 to criminal charges arising from its violation of U.S. trade sanctions. As a result of that guilty plea, BNP Paribas S.A. was placed on probation, as of May 1, 2015, for a term of five years. That probation order practically binds BNPP USA – a subsidiary of BNP Paribas S.A. – to probation for approximately two more years, a moderate amount of time.[5] Second, and relatedly, the conduct to which BNPP USA pleaded guilty in this matter pre-dates the imposition of probation in the sanctions matter – *i.e.*, the conduct

---

[5] The other banks that pleaded guilty in the FX investigation, in May 2015, agreed to three-year terms of probation.

9

here did not violate the terms of the bank's ongoing probation. Third, Defendant and its related entities have made substantial efforts to address their compliance and remediation programs, as discussed above.

Fourth, several of the obligations BNPP USA has already committed itself to in the Plea Agreement are similar to terms typically imposed in the context of probation, such as requirements to report to the Antitrust Division credible information regarding possible violations of U.S. antitrust law. The bank also has obligations by virtue of its resolutions with the New York Department of Financial Services and the Federal Reserve to, among other things, continue to remediate its FX business under continuing supervision by those banking regulators.

Given these facts, the Government does not believe the imposition of probation in this case is necessary to achieve the statutory purposes of 18 U.S.C. § 3553(a). The Government notes that, under the Plea Agreement, if the Court rejects this recommendation of the Government and Defendant, the terms of the Plea Agreement would still be in effect.

### B. Restitution

Pursuant to U.S.S.G § 8B1.1, 18 U.S.C. §§ 3563(b)(2), or 3663(a)(3), the Court may order a defendant to pay restitution to the victims of the offense. While not required in an antitrust case, Your Honor noted at the plea hearing that restitution increasingly has been a feature of criminal corporate dispositions over the past few decades. Despite this general trend, there are three factors present here that convinced the Government, after careful consideration, that restitution ought not be imposed upon BNPP USA. Those factors are explained below.

#### 1. Availability of Civil Remedies

The Government believes that here, victims of BNPP USA's conduct will be fairly compensated through civil causes of action, including via BNP Paribas' own civil settlement in the amount of $115 million.

In 2013, a number of civil antitrust suits related to the FX market were brought in this District; they were eventually consolidated, in early 2014, into the class action MDL captioned *In re Foreign Exchange Benchmark Rates Antitrust Litigation*, 13-cv-7789 (LGS), which is pending before Judge Schofield. Ultimately, sixteen major international banks, including BNP Paribas, were named as defendants. The complaint alleges that the defendant banks violated the Sherman Act through an overarching, worldwide antitrust conspiracy to manipulate prices in the FX market, between 2003 and 2015. The complaint subsumes all the 2011-2013 FX conduct to which BNPP USA pled guilty.

As of today's date, fifteen of the sixteen defendant banks have settled, with Credit Suisse being the only defendant remaining. Collectively the settlement amounts total approximately $2.3 billion, with each bank's settlement ranging from $15.5 million at the low end, to $394 million at the high end. BNP Paribas and its corporate affiliates have settled with the plaintiffs for $115 million. Judge Schofield has preliminarily approved the settlements, and a fairness hearing is scheduled for May 23, 2018 at 4:30 p.m.

Because this sentencing memorandum is being submitted prior to that time, if any salient facts emerge from the fairness hearing that the Government believes this Court should consider with respect to the sentencing of BNPP USA, it will file a supplemental sentencing memorandum prior to the May 30, 2018 sentencing date.

The classes of injured parties who are able to receive settlement proceeds in the civil class action are twofold: (1) those entities or individuals who, between 2003 and 2015, entered into an FX instrument directly with any of the 16 named bank defendants, including BNP Paribas; and (2) those entities or individuals who, between 2003 and 2015, entered into an FX instrument traded on an exchange, such as an FX future or options contract where the price was in part pegged to FX fix benchmarks or FX trades that were manipulated. The Government believes that these classes generally capture the categories of victims of BNPP USA's conduct in this case.

Plaintiff counsel have developed a comprehensive Plan of Distribution with the help of Kenneth Feinberg, the court-appointed Settlement Administrator, a "leading specialist in mediation and alternative dispute resolution [who] has served as the fund administrator for many of the nation's most widely known disputes and tragic disasters." *See generally* Plan of Distribution, at 1, available at: http://www.fxantitrustsettlement.com/courtdocs. The Plan of Distribution uses five factors to determine how to distribute the total settlement amount among the claimants:
- First, using trade data supplied by the settling banks or by a given claimant, the Plan starts with the notional value of a given trade.
- Second, the Plan looks at the type of instrument involved. For example, the notional value of an FX options trade is discounted 80% to adjust for the reduced exposure to FX spot price movement.
- Third, the Plan uses a multiplier for the liquidity of the currency pair. The less liquid the currency pair, the greater the harm from the conduct, so the larger the claim.
- Fourth, the Plan uses a multiplier for the size of the trade. The larger the trade, the greater the harm from the conduct, so the larger the claim.
- Fifth, the Plan uses certain discounts, such as a temporal discount if the trade took place during a timeframe where the evidence of wrongdoing was not as strong, and a discount if the trade took place on a foreign exchange.

This process will assign a value to each trade, and the sum of these values per claimant will determine that claimant's pro rata share of the settlement. As the above indicates, claimants need not demonstrate that their trading was adversely affected by the conspiratorial conduct at issue, and to what extent; shares will be determined based on features related to the claimants' trades themselves.

The Government believes that the private plaintiffs have the tools at their disposal to notify victims, assign appropriate shares of the settlement to each claimant, and to efficiently get money into those claimants' hands. The Government notes that the majority of the potential victims of BNPP USA's conduct in this case are sophisticated financial entities, who are capable of putting in claims by the deadline (May 16, 2018) and otherwise navigating the civil settlement claims process.

At the plea hearing, Your Honor rightly noted that the adequacy of a civil remedy turns, to a large extent, on what percentage of the estimated losses were recovered in the settlements, and on what percentage of the settlements will go to victims as opposed to plaintiff attorneys. Based on our review of the public record of the civil case, as well as discussions with plaintiff counsel Scott & Scott, the Government provides the following information in response to Your Honor's questions:

- Lead counsel estimate damages from the operative class period to be $5.4 billion to $7 billion. *In re Foreign Exchange Benchmark Rates Antitrust Litigation*, 13-cv-7789 (LGS) (S.D.N.Y.), dkt. no. 925 ("Class Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion for Final Approval of Fifteen Settlement Agreements and Plan of Distribution"), at 17.

- The settlement fund of $2.3 billion, the third largest antitrust settlement in history, represents 33-43% of damages before trebling for the operative class period. *Id*.

- Plaintiff counsel will request 16.51% of the settlement fund for attorneys' fees, 0.97% for expenses, and 0.52% for costs of administering the settlement – *i.e.*, a total of approximately 18%. Class members, therefore, will receive 82% of the settlement fund. 13-cv-7789 (LGS) (S.D.N.Y.), dkt. no. 938 ("Memorandum of Law in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses"), at 2.

- Assuming even a higher-than-typical claims rate, those who submit claims could be looking at recovering up to 100% of their class period damages. 13-cv-7789 (LGS) (SDNY), dkt. no. 925, at 17.

### 2. Impracticability and Burden for the Government to Independently Ascertain Restitution

U.S.S.G §8B1.1 provides that a court may decline to impose restitution where (1) the number of identifiable victims is so large as to make restitution impracticable; or (2) determining complex issues of fact related to the cause of action of the victims' losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process. *See also* 18 U.S.C. § 3663(a)(1)(B)(ii). The Government submits that both factors are present in this case.

The potential victims of BNPP USA's conduct in this case are numerous. They include those who conducted FX trades with BNP Paribas on days affected by Katz's collusive conduct, both traditional customers as well as entities dealing with BNP Paribas in the interdealer market; those who conducted FX trades with Katz's co-conspirator banks on those days; those who conducted FX trades with other entities, on Reuters, or on other electronic platforms that were pegged to the Reuters price that was manipulated, on certain days; and those who traded other FX instruments (such as futures and options) that were pegged to manipulated FX benchmarks or spot prices. Over a period of over a year and a half there are thousands of trades that would fall into those categories.

12

Determining the loss attributable to Katz's conduct for even one of those trades would be time-consuming and resource-intensive, likely requiring expert assistance. An expert would have to account for variables that are at play at any given moment in the FX market in developing a "but for" scenario against which to compare the value of the trade the counterparty actually made. Even developing a proxy for harm that could apply across all collusive episodes would be a highly complicated, time-intensive endeavor, which could substantially delay fulfillment of an important corporate resolution.

The Government would then have to identify victims' identities and locations based on trading data. Although the Government has trading data from several banks, and from Reuters, it does not have records to show every CEEMEA trade that was conducted in the FX market between September 2011 and July 2013. In other words, the Government is not perfectly equipped to identify, based on its present information, every potential victim of the conduct. Given the facts of this case, the Government believes that the civil settlement process is better suited to address the complexities of apportioning harm and identifying victims than this proceeding is.

To be clear, the Government does not take the position that the work that would be required to ascertain a restitution figure in this case simply cannot be accomplished at all. It does believe, however, that this is a paradigmatic case of the restitution analysis complicating or prolonging the sentencing process to such an extent that it would be counterproductive, particularly given the remedies in place in the civil matter.

### 3. Proportionality

The five banks that pleaded guilty earlier in the FX investigation, in May 2015 – Citicorp, JPMorgan Chase & Co., Barclays PLC, The Royal Bank of Scotland plc, and UBS AG – had no orders of restitution imposed against them. Each of the five banks was involved in collusion affecting the euro/dollar, a currency pair traded in the hundreds of billions of dollars each day. Each of the banks was involved in the euro/dollar conspiracy for a longer amount of time than BNPP USA was in its conspiracy. Four of these banks were fined under the alternative fine statute (18 U.S.C. § 3571 (d)) to fines ranging from $395 million at the low end to $925 million at the high end. Given these banks' exposure as compared to BNPP USA's, the Government believes it would be disproportionate to impose restitution here where it was not in the cases of the earlier-pleading banks. In addition, while the availability of civil remedies was clear in 2015 – each of the five banks had, at that point, settled the civil class action – it is even more non-hypothetical now, with the plaintiffs having brought in $2.3 billion dollars and much closer to actually distributing those monies.

## VI. Recommendation

The Government recommends that the Court sentence Defendant in accordance with the Rule 11(c)(1)(C) Plea Agreement, to a fine in the amount of $90 million, and a special assessment of $400, with no order of restitution and no probation imposed. This sentence is sufficient but not greater than necessary to comply with the purposes set forth in 18 U.S.C. §§ 3553(a) and 3572(a).

Respectfully submitted,

JEFFREY D. MARTINO
Chief, New York Office
Antitrust Division

By: _____
Benjamin Sirota, Trial Attorney
David Chu, Trial Attorney
Antitrust Division, New York Office
26 Federal Plaza
New York, NY 10278
(212) 335-8056
Benjamin.Sirota@usdoj.gov
David.Chu@usdoj.gov